STATE of Missouri, Respondent,

v.

Stephen A. BUSS, Appellant.

No. 53265.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 28, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 3, 1989.

Application to Transfer Denied
May 16, 1989.

Irl B. Baris, St. Louis, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

GRIMM, Presiding Judge.

Defendant was indicted and tried for murder in the first degree. The jury found him guilty of murder in the second degree, a class A felony under § 565.021, RSMo 1986.

Defendant raises seven allegations of error.* First, the trial court erred in admitting evidence seized pursuant to a search warrant, because the search warrant was based on a false, incomplete, and misleading affidavit made with reckless disregard for the truth. We disagree, because the point was not preserved and is not properly reviewable; further there was no plain error since the search warrant was based on probable cause. Second, the trial court erred in permitting the State to introduce defendant's incriminating statements made while in police custody. We disagree, because defendant voluntarily waived his *Miranda* rights. Third, the trial court erred in allowing the prosecutor to inform prospective jurors during voir dire that the co-defendant had entered into a plea arrangement. Although error was committed, defendant was not prejudiced.

Fourth, the trial court erred in failing to declare a mistrial or strike testimony regarding information contained in the investigating officers' notes. We disagree, because the State had no duty to produce the destroyed notes. Fifth, the trial court erred in permitting the State to make statements and present evidence that defendant had been engaged in homosexual activities and possessed pornographic material. We disagree, because the statements and evidence were not "evidence of other crimes," and they were relevant to the State's theory of motive. Sixth, the trial court erred in overruling defendant's motion for judgment of acquittal. We disagree, because the State presented sufficient evidence to make a submissible case. Seventh, the trial court erred in denying defendant's new trial motion on newly discovered evidence. We disagree, because the evidence was cumulative and of an impeaching nature. We affirm.

As required, we examine the evidence in the light most favorable to the verdict and disregard all adverse inferences and evidence. *State v. Allen,* 684 S.W.2d 417, 423–424 (Mo.App.E.D.1984). Defendant owned and rehabilitated properties in South St. Louis. The co-defendant, Michael Reed, had known the defendant for ten or eleven years and, for the last five years, worked for him in this business. Reed, along with others in that area, knew defendant as

* We note that counsel on appeal was not the trial counsel.

"Mike" or "Mike Anderson." In 1984 or 1985, when Reed learned defendant's real name was Stephen Buss, defendant told him not to disclose it. When another employee learned defendant's real name, defendant told the employee that it was top secret and the penalty for disclosing it would be death.

In 1984, when the Reed family lived in the same South St. Louis apartment house as the victim and her family, defendant occasionally came to the house to see the Reeds. In 1985, there was apparent animosity between the victim and defendant. The victim's daughter witnessed arguments between her mother and defendant on four occasions. The victim would refer to defendant as "Fag Mike," and he would get angry; he threatened to "get her back" later. When the victim told defendant she could get something from the police to keep him away, he replied, "Well, if you come down the street I could kill you anyway." One week before her disappearance, the victim told Reed that she knew defendant's name was Steve Buss.

On the night of April 4, 1986, Reed, at defendant's direction, asked the victim to go with him to burglarize defendant's Creve Coeur home. She went with Reed to defendant's home. Reed and the victim entered the house; defendant appeared and asked her, "Why did you have to go that far?" When Reed turned around, she was lying on the floor and defendant was standing over her.

Defendant tied her hands and feet with rope; then with handcuffs and chains. When she asked defendant why he was doing this, he replied, "You shouldn't have been nosing in my business this far, and you wouldn't have to worry about something like this." Defendant then used a screwdriver to force rags into her mouth. Defendant put her in a sleeping bag and, with Reed's assistance, placed her in the trunk of his car. Defendant told Reed he could leave, and that he (defendant) was going to take care of it from there.

Later, defendant told Reed that he took the victim to the Mississippi River, held her under water for about ten minutes until the bubbles stopped, swam out into the currents, and pushed her away. Defendant added that her bones had probably floated down to Mexico. About a week before Reed was arrested, he told defendant that if he were arrested, he would not take the blame for the victim's death. Defendant told him not to talk, and he would have an attorney for Reed within thirty minutes.

The victim's body was found in the Mississippi River on April 28, 1986. The cause of death was listed as asphyxiation or suffocation due to drowning.

One of the victim's shoes was recovered with the body and had Reed's name handprinted on the inner sole. The police went to one of defendant's properties looking for Reed, and told defendant and his employees that they wanted to talk to Reed. Later, defendant made a phone call stating that Reed had been arrested and accused of "killing some girl." He wanted to get an attorney for Reed so that the police wouldn't "beat him up and make him confess to something he didn't do."

In his first point, defendant alleges that under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the trial court erred in admitting evidence seized pursuant to a search warrant. He argues that the search warrant was based on a false, incomplete, and misleading affidavit which was made with an intent to deceive or reckless disregard for the truth.

"A constitutional attack on the veracity of a search warrant affidavit, sufficient to void the search warrant and exclude the fruits of the search conducted thereunder, may proceed only on the 'substantial preliminary showing' prescribed in *Franks*, ..." *State v. Skaggs*, 650 S.W.2d 23, 25 (Mo.App.E.D.1983). To mandate an evidentiary hearing:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise

reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks,* 438 U.S. at 171, 98 S.Ct. at 2684.

■ This showing usually must be made by a motion to suppress, *Skaggs* at 25. Here, defendant failed to raise allegations of deliberate falsehood or reckless disregard for the truth in either of his two motions to suppress evidence. Moreover, the issue was not raised during the trial or in defendant's motion for new trial. Because defendant failed to raise the issue in the trial court, his point was not preserved and, thus, is not reviewable on appeal.

■ In examining this point for plain error, we find that sufficient probable cause existed for the issuance of the search warrant. Accordingly, there was no plain error resulting in manifest injustice. Point denied.

■ Defendant next contends that the trial court erred in admitting evidence of incriminating oral and written statements made by him while in police custody.

Defendant filed a motion to suppress alleged statements wherein he claimed: (1) his repeated requests for an attorney were denied; (2) he initialled the *Miranda* rights listed on the warning and waiver form, but refused to sign it until his attorney was present; (3) notes written by him during the questioning were the product of police coercion and physical abuse; and (4) he made no admissions or confessions as alleged by the police. Defendant and the two interrogating police officers testified at the hearing on this motion.

The trial court overruled the motion without stating its reason for doing so. "Implicit in the trial court's silence and admission of the statements at trial is the conclusion that [defendant's] testimony ... lacked credibility and that the statements were voluntarily given." *State v. Royal,* 610 S.W.2d 946, 948 (Mo. banc 1981). Where there is conflicting evidence on the existence and voluntariness of defendant's statements, as there is here, the admissibility of the statements by the trial court is "a matter of discretion which is not lightly

disturbed." *Id.* at 949. The trial court's implicit finding of voluntariness is substantially supported by the record.

Defendant maintains that his refusal to sign a *Miranda* waiver form indicates he desired to remain silent and requested an attorney. However, "[a] refusal to sign a written declaration does not necessarily preclude an oral or implied waiver" of *Miranda* rights. *State v. Evans,* 701 S.W.2d 569, 576 (Mo.App.E.D.1985) (quoting *State v. Hull,* 595 S.W.2d 49, 51 (Mo.App.S.D. 1980)). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.'" *North Carolina v. Butler,* 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)). *See Evans* at 576. "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Butler,* 441 U.S. at 373, 99 S.Ct. at 1757; *See Evans* at 576.

According to the officers, defendant was arrested in his home at approximately 8:00 a.m. He was taken to a police station in Clayton. At approximately 9:00 a.m. he was orally advised of his *Miranda* rights. At the same time, he was given a warning and waiver form; defendant initialed each right and stated that he understood them. Defendant refused to sign the waiver form because the word "suspect" appeared below the signature line; however, defendant stated that he wanted to talk to the officers.

During the initial interview, defendant said he hardly knew the victim, and he denied knowing anything about her death. This interview ended approximately at noon. The questioning resumed at 7:00 p.m. when defendant was asked where he was on the night the victim was killed. Defendant stated he was at home, alone. At this time, defendant requested a copy of the autopsy report and asked to hear Reed's taped statement.

At 11:30 p.m. defendant was again advised of his rights. Defendant was allowed

to hear Reed's taped statement. While listening to Reed's statement, defendant shook his head from side to side and said "Michael, why did you say so much?" At the conclusion of the tape, defendant said that Reed's statement was substantially correct, and Reed did not intend to hurt the victim. Defendant, referring to himself, stated he was not a cold-blooded killer and that she just died. When the officers inquired about the location of the body, defendant replied, where else would you put a body; either in the river or the woods. He said he knew of no good woods around his house, so he chose the river.

Defendant requested a pen and paper so he could give a written statement. The officers left, and he wrote a statement.

The officers testified that (1) no physical force was used and no threats of physical force were made; (2) defendant verbally stated he was willing to talk; (3) he did not express a desire to stop the questioning; and (4) he did not request to speak to an attorney.

There is substantial evidence to support a finding that defendant voluntarily made the challenged statements while in police custody. Thus, we find no abuse of discretion in the admission of defendant's statements. Point denied.

■ In his third point, defendant alleges that the trial court erred in allowing the prosecutor to inform prospective jurors, during voir dire that the co-defendant had entered into a plea arrangement with the State.

In Missouri, "it is deemed error, usually reversible error, to show in evidence *or tell the jury* that a jointly accused defendant has been convicted or plead guilty." *State v. Jordan,* 627 S.W.2d 290, 293 (Mo. banc 1982) (emphasis original) (quoting *State v. Fenton,* 499 S.W.2d 813, 816 (Mo.App.S.D. 1973)). This general rule was recognized again in *State v. Lingar,* 726 S.W.2d 728, 735 (Mo. banc 1987). *But see State v. Hobby,* 706 S.W.2d 232, 233–234 (Mo.App. W.D.1986). Under *Jordan* and *Lingar* the trial court erred in allowing the State's inquiry.

Was defendant prejudiced by this error? We find that he was not. Reed testified for the State. No questions were asked on direct examination concerning the plea arrangement. On cross-examination, however, defendant raised questions about the plea arrangement and interrogated Reed concerning it. Defendant suffered no prejudice; the third point is denied.

■ Defendant next contends that the trial court erred in failing to declare a mistrial or strike the testimony of the investigating officers regarding matters allegedly contained in the officers' original notes. These notes were destroyed when the police report was completed. Defendant argues that the officers had a duty to retain their notes and the State should have provided the notes during discovery.

Defendant relies on Missouri Supreme Court Rule 25.03(A)(1) and (2). However, "[n]o rule of criminal discovery in Missouri requires that the prosecution provide the defendant with a copy of a policeman's handwritten notes." *State v. Griffin,* 692 S.W.2d 314, 315 (Mo.App.E.D.1985).

A copy of the police report, containing information from the officers' original notes, was given to defense counsel. Two hearings were held on motions to suppress, where the investigating officers testified and were extensively cross-examined. The trial court did not err; the point is denied.

In defendant's fifth point, he contends that the trial court erred in "permitting the State to make statements, present evidence, and argue that [defendant] had been engaged in homosexual activities and possessed pornographic material...." Defendant argues that the prejudicial impact of these "references to" and "evidence of other crimes" outweighed any probative value.

In support of this contention, defendant directs our attention to various portions of the trial transcript. First, during opening statement, the prosecutor quoted defendant's written statement as saying it had been made " 'in exchange for not bringing anything into the courtroom about homosexual activities.' " Defendant's statement actually reads: "This statement is made

with the understanding ... that there will be no prosecution regarding sexual activities or any materials seized from my houses."

 While it is clear that the prosecutor misquoted defendant's statement, the issue was not preserved for our review since no objection was made and the issue was not raised in the new trial motion. Since defendant's written statement was subsequently admitted into evidence and read in its entirety to the jury, we find no plain error resulting in manifest injustice.

 Second, the victim's daughter testified that prior to her mother's death she had known defendant by the name of "Fag Mike." Defendant raised no objection to this testimony. The prosecutor then asked the witness, "This person that you knew as Fag Mike, how long had you known him?" Defendant objected and argued that the name had previously been introduced and the prosecutor was attempting "to inflame the jury by calling [defendant] by a homosexual name." Defendant's objection was overruled.

The name "Fag Mike" was already before the jury. Even though the trial court overruled defendant's objection, the prosecutor rephrased the question and omitted the name "Fag Mike." The only other references to the name occurred when the prosecutor asked this witness if she knew of her mother having "an encounter with this person you knew as Fag Mike;" when the co-defendant testified that the defendant would "heat up" when the victim referred to him as "Fag Mike;" and twice during closing argument when the prosecutor referred to the testimony of these witnesses. No objection was made to any of these references.

The references to the name "Fag Mike" are at most innuendos and do not rise to the level of evidence of other crimes. There was no mention of specific prior criminal acts and the testimony regarding the name "Fag Mike" was relevant to the State's theory of motive. See State v. Randolph, 729 S.W.2d 524, 526–527 (Mo. App.E.D.1987).

Defendant also complains about the State's examination of the co-defendant when he was asked if he was "more than just a friend of Stephen Buss?" After responding that he was, he was asked if it involved "sexual activity." Defendant objected and requested a mistrial on the ground that the State was "bringing a non-issue into the case of homosexual activity between the parties to inflame the jury." The objection was overruled. The prosecutor repeated the question to which the witness responded, "Somewhat, yes."

This testimony, as well as other testimony and exhibits mentioned in defendant's brief, did not rise to the level of evidence of other crimes. There was no reference to a specific criminal act. In addition, the testimony was relevant to the State's theory of motive. Defendant's fifth point is denied.

Defendant's sixth point alleges that the trial court erred in refusing to direct a judgment of acquittal because the State failed to make a submissible case.

 Defendant asserts that this is a case based entirely on circumstantial evidence. He urges us to apply the standard of review set forth in State v. Biddle, 599 S.W.2d 182 (Mo. banc 1980). However, this is not a case based entirely on circumstantial evidence. Defendant's admissions constitute direct evidence. State v. Bannister, 680 S.W.2d 141, 148 (Mo. banc 1984). As such, the standard of review urged by defendant is not applicable.

 The State made a submissible case based on the physical evidence, together with Reed's testimony and defendant's admissions. The trial court did not err in overruling defendant's motion for judgment of acquittal.

 In his final point, defendant alleges that the trial court erred in denying his motion for new trial on newly discovered evidence.

"New trials on the basis of newly discovered evidence are not favored, and the trial court is vested with substantial discretion in deciding whether such should be granted." State v. Amrine, 741 S.W.2d 665, 674 (Mo. banc 1987). Our Supreme Court has held:

To receive a new trial based on newly discovered evidence the following must be established: (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credit of the witness.

*State v. Williams*, 652 S.W.2d 102, 114 (Mo. banc 1983).

With his motion, defendant submitted the statements of two inmates who had been confined with Reed. One stated that "Reed said he was being convicted of a murder charge and was only getting a ten-year sentence and he felt kind of bad because in order to receive a light sentence he had to lie in court that a friend of his was involved when he really wasn't...." The other stated that he overheard Reed tell Bill Pettypool, another inmate, that Reed "really hated to set this guy Steve up, but he had to do it...."

We do not agree with defendant's contention that these statements "revealed beyond question" that Reed committed perjury. At defendant's trial, Pettypool had testified that Reed told him he hit the victim while he and she were at Laclede's Landing. According to Pettypool, Reed said he held her under water until she stopped kicking and then he pushed her out into the water.

The inmates' statements, like Pettypool's testimony, relate to Reed's credibility. A new trial is not required when the newly discovered evidence merely impeaches the credibility of the witness. *Id.* Accordingly, the trial court did not abuse its discretion.

The judgment is affirmed.

KAROHL and GARY M. GAERTNER, JJ., concur.